Caroline Janzen, OSB #176233
caroline@ruggedlaw.com
Paul Janzen, OSB #176240
paul@ruggedlaw.com
Rugged Law, Inc.
5201 SW Westgate Drive,
Bldg. B, Ste. 300
Portland, Oregon 97221
503-520-9900
Of Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| MANDI RAE LUMLEY, an individual, and, TIKKUN OLAM HOLDINGS, a limited liability company,<br><br>               Plaintiffs,<br>  v.<br><br>UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA,<br><br>               Defendants. | Case No. 25-2003<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Page 1 – **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Rugged Law, Inc.
5201 SW Westgate Drive, Bldg. B, Ste. 300
Portland, Oregon 97221
503-520-9900

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs allege their complaint against Defendants as follows:

## I.  INTRODUCTION

1. This case involves a Yakama Indian Tribe member and her rights under the 1855 Yakama treaty with the United States of America that established, *inter alia*, that the Yakama people are to be exempted from tariffs, taxes, levies, and/or fees imposed by the United States on imported goods. *See* Exhibit 1, Treaty Between the United States and the Yakama Nation of Indians, June 9, 1855, 12 Stat. 951.

2. The Yakama Indian Reservation (spelled Yakama until 1994) is a Native American reservation in Washington state of the federally recognized tribe known as the Confederated Tribes and Bands of the Yakama Nation. The tribe is made up of Klikitat, Palus, Wallawalla, Wenatchi, Wishram, and Yakama peoples.

3. This is a civil action for declaratory and injunctive relief commenced against the United States, its agencies, and its officers, arising out of the Defendants' imposition of tariffs in reliance on IEEPA, a law that they wrongly assert provides for tariffs on the Yakama Nation.

4. Plaintiff Mandi Rae Lumley is an enrolled member in good standing of the Yakama Tribe (see Exhibit 2, Verification Documents) and Plaintiff Tikkun Olam Holdings, a Limited Liability Corporation, a company owned by Plaintiff Mandi Rae Lumley is incorporated in the State of Delaware and doing substantial business in the State of Oregon.

## II.  THE PARTIES

5. Plaintiff Mandi Rae Lumley is an enrolled member in good standing of the Yakama Indian Reservation. *See* Exhibit 2. She owns Tikkun Olam Holdings, LLC, a company intended to import goods from international vendors, including within the District of Oregon.

Page 2 – **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Rugged Law, Inc.**
5201 SW Westgate Drive, Bldg. B, Ste. 300
Portland, Oregon 97221
503-520-9900

6. Plaintiff Tikkun Olam Holdings, LLC is a limited liability corporation incorporated in the State of Delaware and doing substantial business in the District of Oregon. Plaintiff Tikkun Olam Holdings is owned at least fifty percent (50%) by a member of the Yakama Indian Reservation, Plaintiff Mandi Rae Lumley .

7. Defendant U.S. Customs and Border Protection (Customs) is a federal agency headquartered in Washington, D.C.

8. Defendant Pete R. Flores is the Acting Commissioner for Customs and is sued in his official capacity.

9. Defendant Department of Homeland Security (DHS) is a federal agency headquartered in Washington, D.C.

10. Defendant Kristi Noem is the Secretary of DHS and is sued in her official capacity. The Complaint refers to Secretary Noem, along with DHS, Acting Commissioner Flores, and Customs, as the "DHS Defendants."

11. Defendant U.S. International Trade Commission (USITC) is a federal agency headquartered in Washington, D.C.

12. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

13. Defendant United States of America is a sovereign entity and the government of the United States.

14. Defendant Executive Office of the President is a federal agency, head- quartered in Washington, D.C..

### III.  JURISDICTION AND VENUE

15. This Court has jurisdiction over this complaint under 28 U.S.C. §§ 1331 and 2201

Page 3 – **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Rugged Law, Inc.**
5201 SW Westgate Drive, Bldg. B, Ste. 300
Portland, Oregon 97221
503-520-9900

because this case presents a substantial question of federal law, specifically whether the tariffs imposed on certain imported goods by the Defendants violate the Yakama Treaty of 1855 as applied to a member of the Yakama Indian Reservation and Yakama Indian-owned business.

16. This Court has authority to issue a declaratory judgment and to order injunctive relief and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

17. Venue is appropriate in this district under 28 U.S.C. § 1391(e)(1). A substantial part of the events giving rise to this claim occurred in this District, Defendants maintain one or more offices and employees in this District, and Plaintiffs do substantial business in the District.

IV. **LEGAL AND FACTUAL BACKGROUND**

18. President Trump has issued a series of Executive Orders imposing tariffs and claiming authority pursuant to the Constitution and the laws of the United States, including IEEPA, the National Emergencies Act (NEA), section 604 of the Trade Act of 1974, and 3 U.S.C. § 301.

19. The NEA, Pub. L. 94-412, 90 Stat. 1255 (Sept. 14, 1976), codified as amended at 50 U.S.C. §§ 1601-51, and IEEPA, Pub. L. 95-223 (Title III), 91 Stat. 1626 (Dec. 28, 1977), codified as amended at 50 U.S.C. §§ 1701-10, were both adopted in the 1970s, following congressional investigation and evaluation of statutes providing the President with substantial emergency powers, and on the heels of perceived presidential abuses of power.

20. The NEA sets forth a process for presidential declarations of national emergency and congressional review and termination of the same. 50 U.S.C. §§ 1621- 22.

21. On January 20, 2025, President Trump issued an America First Trade Policy Memorandum, directing his administration to, among other things, investigate the causes of the United States' "large and persistent annual trade deficit in goods" and the "economic and national security implications and risks resulting from such deficits." America First Trade Policy, 90 Fed.

Page 4 – **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Rugged Law, Inc.**
5201 SW Westgate Drive, Bldg. B, Ste. 300
Portland, Oregon 97221
503-520-9900

Reg. 8471 (Jan. 30, 2025), § 2(a). The President further directed his administration to "recommend appropriate measures, such as a global supplemental tariff or other policies, to remedy such deficits," and to recommend the best methods to collect tariffs, duties, and other foreign trade-related revenues. Id. § 2(a)-(b). President Trump issued a series of similar memoranda since.

22. "In 1899 the U.S. Supreme Court ruled that the treaties with Indian Tribes were to be interpreted and construed as the Indians would have understood them, with emphasis given to the Tribes' history, culture and traditions and in 1908 the same Court held that any ambiguities found in the treaties would be construed to the benefit of the Indians." *Todd v. General Motors Corp.*, 1995 Mont. Fort Peck Tribe LEXIS 1, *8-9. "A treaty with Indians must be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.…" *Jones v. Meehan*, 175 U.S. 1, 2, 20 S. Ct. 1, 2, 44 L. Ed 49, 50 (1899). "The language used in treaties with the Indians should never be construed to their prejudice.…" *Id.* at 11.

23. The Ninth Circuit has described treaty interpretation jurisprudence thusly:

> Supreme Court jurisprudence teaches that Indian Treaties must be interpreted as the Indians would have understood them. The Indian Nations did not seek out the United States and agree upon an exchange of lands in an arm's-length transaction. Rather, treaties were imposed upon them and they had no choice but to consent. As a consequence, this Court has often held that treaties with the Indians must be interpreted as they would have understood them....*Choctaw Nation v. Oklahoma*, 397 U.S. 620, 630–31, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970) (citations omitted). It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people. *Tulee v. Washington*, 315 U.S. 681, 684–85, 62 S.Ct. 862, 86 L.Ed. 1115 (1942) (citation omitted); *see also United States v. Winans*, 198 U.S. 371, 380–81, 25 S.Ct. 662, 49 L.Ed. 1089 (1905) ("we will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand ....'" (citation omitted)); *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658,

Page 5 – **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Rugged Law, Inc.**
5201 SW Westgate Drive, Bldg. B, Ste. 300
Portland, Oregon 97221
503-520-9900

676, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) ("Fishing Vessel "); *Jones v. Meehan*, 175 U.S. 1, 11, 20 S.Ct. 1, 44 L.Ed. 49 (1899). *Cree v. Flores*, 157 F3d 762, 769 (9th Cir. 1998).

24.     Under Article VI, Clause 2 of the United States Constitution, all treaties made with Indian tribes are "the supreme Law of the Land." In order to modify a treaty with an Indian tribe, there must be "substantial and compelling evidence of such an [congressional] intent…" to modify or alter the terms of a treaty with a tribe." *Solem v. Bartlett*, 465 US 463, 464, 104 S Ct 1161, 1163, 79 LEd2d 443, 446 (1984).

25.     The 1855 Yakama Treaty with the United States provides for the purchase by the United States of Yakama land. *See* Exhibit 1, Treaty Between the United States and the Yakama Nation of Indians, June 9, 1855, 12 Stat. 951. Under the treaty, the Yakamas granted to the United States approximately 10 million acres of land in what is now the State of Washington, i.e., about one-fourth of the land that makes up the State today. Art. I, id., at 951–952. In return for this land, the United States paid the Yakamas $200,000, made improvements to the remaining Yakama land, such as building a hospital and schools for the Yakamas to use, and agreed to respect the Yakamas' reservation of certain rights. Arts. III–V, 12 Stat. 952–953. *Washington State Dept. of Licensing v. Cougar Den, Inc.*, 586 US 347, 351–52, 139 S Ct 1000, 1007, 2019-1 US Tax Cas ¶ 70352, 203 L Ed 2d 301 (2019).

26.     There has been no Congressional effort to abrogate the 1855 Yakama Treaty.

27.     The treaty of 1855 permits members of the Yakama tribe to use any public highway to carry on free trade with any trading partner, which at the time included both roads on land, railroads, as well as waterways which were traditional highways used by northwest tribes to carry on trade. For example, the Columbia River was a major trading route and much transportation and trade was carried on by canoe throughout the Columbia River Valley by the Yakama Tribe.

Page 6 – **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Rugged Law, Inc.**
5201 SW Westgate Drive, Bldg. B, Ste. 300
Portland, Oregon 97221
503-520-9900

28. The right to carry on trade freely should apply to any future means of transportation for carrying on trade, including but not limited to travel by land or sea but also air travel and space travel.

29. The negotiations for the treaty of 1855 involved ceding land so that the United States could build roads and railroads through the State of Washington. Part of the treaty negotiations included the use of these transportation corridors for the benefit of the tribe to carry on trade. The trading partners of the Yakama Tribe prior to and during the time of the treaty included coastal tribes trading international goods, plains tribes trading buffalo, as well as international trade with the Hudson Bay Company.

30. The types and means of travel and the locations and types of trade carried on by the Yakama were broad and extensive at the time the treaty was executed. It involved multiple types of transportation modalities and the trade of many different types of goods with other tribes, white settlers, and international corporations.

31. Consequently, the definition of the word highway in the 1855 Yakama Treaty should be construed broadly to include all potential forms of transportation and trade by any medium, including both roads on land as well as rivers, sea ports, airports, and spaceports.

32. Yakama carried on trade both within their traditional territory and throughout the Midwest and Pacific Northwest in areas that were not within the Tribe's reservation original territorial boundaries or current reservation boundaries. Tribal members would travel from the Pacific Ocean to the Great Plains to carry on trade with other tribes. For example, they would take salmon harvested in the Columbia River basin to the plains tribes and trade it for buffalo products, and then bring buffalo products back to the Pacific Northwest to trade with other northwest tribes that lacked access to buffalo hides and meat. As interpreted by the Yakama at the time of its

Page 7 – **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Rugged Law, Inc.**
5201 SW Westgate Drive, Bldg. B, Ste. 300
Portland, Oregon 97221
503-520-9900

execution, the Treaty permitted tribal members to continue to freely carry on trade without tariff or fee both on reservation and off reservation anywhere on United States territory.

33. Under 25 U.S. Code § 4302(6), The term "Indian-owned business" means an entity organized for the conduct of trade or commerce with respect to which at least 50 percent of the property interests of the entity are owned by Indians or Indian Tribes (or a combination thereof). Consequently, in order to enjoy the rights and privileges of a Yakama tribal member under the 1855 treaty, a business must be at least 50% owned by a member of the Yakama Tribe.

34. Plaintiff Mandi Rae Lumley is a registered member of the Yakama Tribe, and is entitled to buy, sell, or import any good free of any tariff, sales tax, or other duty, by virtue of her rights under the Yakama Treaty of 1855. Any business where she is at least a 50 percent owner qualifies for the rights and protections guaranteed to her under the Yakama Treaty of 1855.

V.     CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

35. Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

36. The Defendant's prospective imposition of tariffs on goods imported by the Plaintiffs would violate the 1855 Yakama Treaty.

37. The Supreme Court held that "a specific statute controls over a general one without regard to priority of enactment." *Bulova Watch Co. v. United States*, 365 US 753, 758, 81 S Ct 864, 868, 6 LEd2d 72, 76 (1961) (internal citations omitted).

38. The specific treaty exemption from sales taxes and tariffs guaranteed to the Yakama tribe in the 1855 Treaty takes precedence over any generally applicable sales tax or tariff, even if those statutes or orders were passed after the Treaty was executed. Because the treaty is with an Indian tribe, Congressional intent to abrogate treaty obligations is strictly construed and

Page 8 – **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Rugged Law, Inc.**
5201 SW Westgate Drive, Bldg. B, Ste. 300
Portland, Oregon 97221
503-520-9900

congressional intent to modify those obligations must be substantial and compelling, in addition to the required consent of the tribe to change the terms of the treaty. *See supra*, *Solem v. Bartlett*, 465 US at 464.

39. Plaintiff Mandi Rae Lumley, as an enrolled member of the Yakama Tribe, has the right to freely carry on trade without sales taxes, tariffs, permit fees, or any other tax, duty, or fee of any kind by any state, federal, or territorial government of the United States.

40. Any company that is at least half owned by Plaintiff Mandi Rae Lumley also has the right to carry on trade freely without imposition of any tax, tariff, or fee on any good that she imports or sells in the United States.

41. The tariffs imposed by the Defendants on certain imported goods should be declared as unlawful as applied to the Plaintiffs.

42. This conclusion is consistent with the Supreme Court's decision in *Washington State Dept. of Licensing v. Cougar Den, Inc.*, 586 US 347, 359-63, 139 S Ct 1000, 1011-13, 2019-1 US Tax Cas 70352, 203 L Ed 2d 301 (2019). In that case, the Supreme Court found that the State of Washington's application of the fuel tax to Cougar Den's importation of fuel was preempted by the treaty's reservation to the Yakama Nation of "the right, in common with citizens of the United States, to travel upon all public highways." The Court rested that conclusion upon three considerations taken together.

43. First, the Supreme Court has considered 1855 Treaty four times previously and each time it stressed that the language of the treaty should be understood as bearing the meaning that the Yakamas understood it to have in 1855. The cases base their reasoning in part upon the fact that the treaty negotiations were conducted in, and the treaty was written in, languages that put the Yakamas at a significant disadvantage. The parties negotiated the treaty in Chinook jargon, a

Page 9 – **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Rugged Law, Inc.**
5201 SW Westgate Drive, Bldg. B, Ste. 300
Portland, Oregon 97221
503-520-9900

trading language of about 300 words that no Tribe used as a primary language. The parties memorialized the treaty in English, a language that the Yakamas could neither read nor write. And many of the representations that the United States made about the treaty had no adequate translation in the Yakamas' own language. Thus, in the year 1905, the Supreme Court wrote that, to interpret the treaty, courts must focus upon the historical context in which it was written and signed.

44. Second, the historical record indicated that the right to travel includes a right to travel with goods for sale or distribution. When the United States and the Yakamas negotiated the treaty, both sides emphasized that the Yakamas needed to protect their freedom to travel so that they could continue to fish, to hunt, to gather food, and to trade. The Yakamas maintained fisheries on the Columbia River, following the salmon runs as the fish moved through Yakama territory. The Yakamas traveled to the nearby plains region to hunt buffalo. They traveled to the mountains to gather berries and roots. The Yakamas' religion and culture also depended on certain goods, such as buffalo byproducts and shellfish, which they could often obtain only through trade. *Id.*, at 61a–62a. Indeed, the Yakamas formed part of a great trading network that stretched from the Indian tribes on the Northwest coast of North America to the plains tribes to the east. The United States' representatives at the treaty negotiations well understood these facts, including the importance of travel and trade to the Yakamas. They repeatedly assured the Yakamas that under the treaty the Yakamas would be able to travel outside their reservation on the roads that the United States built. (" '[W]e give you the privilege of traveling over roads' "). And the United States repeatedly assured the Yakamas that they could travel along the roads for trading purposes..

45. Third, the Supreme Court held that to impose a tax upon traveling with certain goods burdens that travel and the right to travel on the public highways without such burdens is

Page 10 – **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Rugged Law, Inc.**
5201 SW Westgate Drive, Bldg. B, Ste. 300
Portland, Oregon 97221
503-520-9900

just what the treaty protects. *Id*.

## VI.     RELIEF REQUESTED

Accordingly, and based on the foregoing paragraphs, Plaintiffs respectfully request that this Court:

A.   Expedite resolution of this action to prevent further harm to Plaintiffs;

B.   Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, holding that the imposition of tariffs by the actions described above and any future actions imposing tariffs pursuant to IEEPA and any other federal law, are unlawful as applied to Plaintiffs because the 1855 Treaty permits Plaintiffs to import without the imposition of said tariffs;

C.   An injunction, pursuant to 28 U.S.C. § 2202, prohibiting the Defendants from imposing tariffs on Plaintiffs during the pendency of this action;

D.   An award of reasonable attorney fees and costs to Plaintiffs pursuant to 28 U.S.C. § 2412 or any other applicable authority; and

E.   Any other relief the Court deems just and proper.

DATED this 29th day of October, 2025.

RUGGED LAW, INC.

/s/ *Caroline Janzen*
Caroline Janzen, OSB #176233
caroline@ruggedlaw.com
Paul Janzen, OSB #176240
paul@ruggedlaw.com
Of Attorneys for Plaintiff

Page 11 – **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Rugged Law, Inc.
5201 SW Westgate Drive, Bldg. B, Ste. 300
Portland, Oregon 97221
503-520-9900

Signed in the presence of—

    James Doty, secretary treaties.
    Wm. C. McKay, secretary treaties.
    C. Chirouse, O. M. I.
    A. D. Pamburn, interpreter.
    John Whitford, his x mark, interpreter.
    Mathew Dofa, his x mark, interpreter.
    William Craig, interpreter.
    James Coxey, his x mark, interpreter.
    Patrick McKenzie, interpreter.
    Arch. Gracie, jr., brevet second lieutenant, Fourth Infantry.
    R. R. Thompson, Indian agent.
    R. B. Metcalfe, Indian sub-agent.

## TREATY WITH THE YAKIMA, 1855.

*June 9, 1855.*
*12 Stat., 951.*
*Ratified Mar. 8, 1859.*
*Proclaimed Apr. 18, 1859.*

*Articles of agreement and convention made and concluded at the treaty-ground, Camp Stevens, Walla-Walla Valley, this ninth day of June, in the year one thousand eight hundred and fifty-five, by and between Isaac I. Stevens, governor and superintendent of Indian affairs for the Territory of Washington, on the part of the United States, and the undersigned head chiefs, chiefs, head-men, and delegates of the Yakama, Palouse, Pisquouse, Wenatshapam, Klikatat, Klinquit, Kow-was-say-ee, Li-ay-was, Skin-pah, Wish-ham, Shyiks, Oche-chotes, Kah-milt-pah, and Se-ap-cat, confederated tribes and bands of Indians, occupying lands hereinafter bounded and described and lying in Washington Territory, who for the purposes of this treaty are to be considered as one nation, under the name of "Yakama," with Kamaiakun as its head chief, on behalf of and acting for said tribes and bands, and being duly authorized thereto by them.*

*Cession of lands to the United States.*

ARTICLE 1. The aforesaid confederated tribes and bands of Indians hereby cede, relinquish, and convey to the United States all their right, title, and interest in and to the lands and country occupied and claimed by them, and bounded and described as follows, to wit:

*Boundaries.*

Commencing at Mount Ranier, thence northerly along the main ridge of the Cascade Mountains to the point where the northern tributaries of Lake Che-lan and the southern tributaries of the Methow River have their rise; thence southeasterly on the divide between the waters of Lake Che-lan and the Methow River to the Columbia River; thence, crossing the Columbia on a true east course, to a point whose longitude is one hundred and nineteen degrees and ten minutes, (119° 10',) which two latter lines separate the above confederated tribes and bands from the Oakinakane tribe of Indians; thence in a true south course to the forty-seventh (47°) parallel of latitude; thence east on said parallel to the main Palouse River, which two latter lines of boundary separate the above confederated tribes and bands from the Spokanes; thence down the Palouse River to its junction with the Moh-hah-ne-she, or southern tributary of the same; thence in a southesterly direction, to the Snake River, at the mouth of the Tucannon River, separating the above confederated tribes from the Nez Percé tribe of Indians; thence down the Snake River to its junction with the Columbia River; thence up the Columbia River to the "White Banks" below the Priest's Rapids; thence westerly to a lake called "La Lac;" thence southerly to a point on the Yakama River called Toh-mah-luke; thence, in a southwesterly direction, to the Columbia River, at the western extremity of the "Big Island," between the mouths of the Umatilla River and Butler Creek; all which latter boundaries separate the

Exhibit 1 Page 1 of 5

TREATY WITH THE YAKIMA, 1855.  699

above confederated tribes and bands from the Walla-Walla, Cayuse, and Umatilla tribes and bands of Indians; thence down the Columbia River to midway between the mouths of White Salmon and Wind Rivers; thence along the divide between said rivers to the main ridge of the Cascade Mountains; and thence along said ridge to the place of beginning.

ARTICLE 2. There is, however, reserved, from the lands above ceded for the use and occupation of the aforesaid confederated tribes and bands of Indians, the tract of land included within the following boundaries, to wit: Commencing on the Yakama River, at the mouth of the Attah-nam River; thence westerly along said Attah-nam River to the forks; thence along the southern tributary to the Cascade Mountains; thence southerly along the main ridge of said mountains, passing south and east of Mount Adams, to the spur whence flows the waters of the Klickatat and Pisco Rivers; thence down said spur to the divide between the waters of said rivers; thence along said divide to the divide separating the waters of the Satass River from those flowing into the Columbia River; thence along said divide to the main Yakama, eight miles below the mouth of the Satass River; and thence up the Yakama River to the place of beginning. *[Reservation. Boundaries.]*

All which tract shall be set apart and, so far as necessary, surveyed and marked out, for the exclusive use and benefit of said confederated tribes and bands of Indians, as an Indian reservation; nor shall any white man, excepting those in the employment of the Indian Department, be permitted to reside upon the said reservation without permission of the tribe and the superintendent and agent. And the said confederated tribes and bands agree to remove to, and settle upon, the same, within one year after the ratification of this treaty. In the mean time it shall be lawful for them to reside upon any ground not in the actual claim and occupation of citizens of the United States; and upon any ground claimed or occupied, if with the permission of the owner or claimant. *[Reservations to be set apart, etc., and Indians to settle thereon. Whites not to reside thereon.]*

Guaranteeing, however, the right to all citizens of the United States to enter upon and occupy as settlers any lands not actually occupied and cultivated by said Indians at this time, and not included in the reservation above named.

*And provided*, That any substantial improvements heretofore made by any Indian, such as fields enclosed and cultivated, and houses erected upon the lands hereby ceded, and which he may be compelled to abandon in consequence of this treaty, shall be valued, under the direction of the President of the United States, and payment made therefor in money; or improvements of an equal value made for said Indian upon the reservation. And no Indian will be required to abandon the improvements aforesaid, now occupied by him, until their value in money, or improvements of an equal value shall be furnished him as aforesaid. *[Improvements on ceded lands.]*

ARTICLE 3. *And provided*, That, if necessary for the public convenience, roads may be run through the said reservation; and on the other hand, the right of way, with free access from the same to the nearest public highway, is secured to them; as also the right, in common with citizens of the United States, to travel upon all public highways. *[Roads may be made.]*

The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land. *[Privileges secured to Indians.]*

Exhibit 1 Page 2 of 5

700                         TREATY WITH THE YAKIMA, 1855.

Payments by the United States. ARTICLE 4. In consideration of the above cession, the United States agree to pay to the said confederated tribes and bands of Indians, in addition to the goods and provisions distributed to them at the time of signing this treaty, the sum of two hundred thousand dollars, in the following manner, that is to say: Sixty thousand dollars, to be expended under the direction of the President of the United States, the first year after the ratification of this treaty, in providing for their removal to the reservation, breaking up and fencing farms, building houses for them, supplying them with provisions and a suitable outfit, and for such other objects as he may deem necessary, and the remainder in annuities, as follows: For the first five years after the ratification of the treaty, ten thousand dollars each year, commencing September first, 1856; for the next five years, eight thousand dollars each year; for the next five years, six thousand dollars per year; and for the next five years, four thousand dollars per year.

How to be applied. All which sums of money shall be applied to the use and benefit of said Indians, under the direction of the President of the United States, who may from time to time determine, at his discretion, upon what beneficial objects to expend the same for them. And the superintendent of Indian affairs, or other proper officer, shall each year inform the President of the wishes of the Indians in relation thereto.

United States to establish schools. ARTICLE 5. The United States further agree to establish at suitable points within said reservation, within one year after the ratification hereof, two schools, erecting the necessary buildings, keeping them in repair, and providing them with furniture, books, and stationery, one of which shall be an agricultural and industrial school, to be located at the agency, and to be free to the children of the said confederated tribes and bands of Indians, and to employ one superintendent of teaching and two teachers; Mechanics' shops. to build two blacksmiths' shops, to one of which shall be attached a tin-shop, and to the other a gunsmith's shop; one carpenter's shop, one wagon and plough maker's shop, and to keep the same in repair and furnished with the necessary tools; to employ one superintendent of farming and two farmers, two blacksmiths, one tinner, one gunsmith, one carpenter, one wagon and plough maker, for the instruction of the Indians in trades and to assist them in the same; Sawmill and flouring mill. Hospital. to erect one saw-mill and one flouring-mill, keeping the same in repair and furnished with the necessary tools and fixtures; to erect a hospital, keeping the same in repair and provided with the necessary medicines and furniture, and to employ a physician; and to erect, keep in repair, and provided with the necessary furniture, the building required for the accommodation of the said employees. The said buildings and establishments to be maintained and kept in repair as aforesaid, and the employees to be kept in service for the period of twenty years.

Salary to head chief; house, etc. And in view of the fact that the head chief of the said confederated tribes and bands of Indians is expected, and will be called upon to perform many services of a public character, occupying much of his time, the United States further agree to pay to the said confederated tribes and bands of Indians five hundred dollars per year, for the term of twenty years after the ratification hereof, as a salary for such person as the said confederated tribes and bands of Indians may select to be their head chief, to build for him at a suitable point on the reservation a comfortable house, and properly furnish the same, and to plough and fence ten acres of land. The said salary to be paid to, and the said house to be occupied by, such head chief so long as he may continue to hold that office.

Kamaiakun is the head chief. And it is distinctly understood and agreed that at the time of the conclusion of this treaty Kamaiakun is the duly elected and authorized

Exhibit 1 Page 3 of 5

head chief of the confederated tribes and bands aforesaid, styled the Yakama Nation, and is recognized as such by them and by the commissioners on the part of the United States holding this treaty; and all the expenditures and expenses contemplated in this article of this treaty shall be defrayed by the United States, and shall not be deducted from the annuities agreed to be paid to said confederated tribes and band of Indians. Nor shall the cost of transporting the goods for the annuity payments be a charge upon the annuities, but shall be defrayed by the United States.

ARTICLE 6. The President may, from time to time, at his discretion, cause the whole or such portions of such reservation as he may think proper, to be surveyed into lots, and assign the same to such individuals or families of the said confederated tribes and bands of Indians as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable. *Reservation may be surveyed into lots and assigned to individuals or families.*

ARTICLE 7. The annuities of the aforesaid confederated tribes and bands of Indians shall not be taken to pay the debts of individuals. *Annuities not to pay for debts of individuals.*

ARTICLE 8. The aforesaid confederated tribes and bands of Indians acknowledge their dependence upon the Government of the United States, and promise to be friendly with all citizens thereof, and pledge themselves to commit no depredations upon the property of such citizens. *Tribes to preserve friendly relations.*

And should any one or more of them violate this pledge, and the fact be satisfactorily proved before the agent, the property taken shall be returned, or in default thereof, or if injured or destroyed, compensation may be made by the Government out of the annuities. *To pay for depredations.*

Nor will they make war upon any other tribe, except in self-defence, but will submit all matters of difference between them and other Indians to the Government of the United States or its agent for decision, and abide thereby. And if any of the said Indians commit depredations on any other Indians within the Territory of Washington or Oregon, the same rule shall prevail as that provided in this article in case of depredations against citizens. And the said confederated tribes and bands of Indians agree not to shelter or conceal offenders against the laws of the United States, but to deliver them up to the authorities for trial. *Not to make war but in self-defense.* *To surrender offenders.*

ARTICLE 9. The said confederated tribes and bands of Indians desire to exclude from their reservation the use of ardent spirits, and to prevent their people from drinking the same, and, therefore, it is provided that any Indian belonging to said confederated tribes and bands of Indians, who is guilty of bringing liquor into said reservation, or who drinks liquor, may have his or her annuities withheld from him or her for such time as the President may determine. *Annuities may be withheld from those who drink ardent spirits.*

ARTICLE 10. *And provided,* That there is also reserved and set apart from the lands ceded by this treaty, for the use and benefit of the aforesaid confederated tribes and bands, a tract of land not exceeding in quantity one township of six miles square, situated at the forks of the Pisquouse or Wenatshapam River, and known as the "Wenatshapam Fishery," which said reservation shall be surveyed and marked out whenever the President may direct, and be subject to the same provisions and restrictions as other Indian reservations. *Wenatshapam fishery reserved.*

ARTICLE 11. This treaty shall be obligatory upon the contracting parties as soon as the same shall be ratified by the President and Senate of the United States. *When treaty to take effect.*

In testimony whereof, the said Isaac I. Stevens, governor and superintendent of Indian affairs for the Territory of Washington, and the undersigned head chief, chiefs, headmen, and delegates of the afore-

Exhibit 1 Page 4 of 5

702                  TREATY WITH THE NEZ PERCÉS, 1855.

said confederated tribes and bands of Indians, have hereunto set their hands and seals, at the place and on the day and year hereinbefore written.

                                             ISAAC I. STEVENS,
                         Governor and Superintendent. [L. S.]

| | | | |
|---|---|---|---|
| Kamaiakun, his x mark. | [L. S.] | Wish-och-kmpits, his x mark. | [L. S.] |
| Skloom, his x mark. | [L. S.] | Koo-lat-toose, his x mark. | [L. S.] |
| Owhi, his x mark. | [L. S.] | Shee-ah-cotte, his x mark. | [L. S.] |
| Te-cole-kun, his x mark. | [L. S.] | Tuck-quille, his x mark. | [L. S.] |
| La-hoom, his x mark. | [L. S.] | Ka-loo-as, his x mark. | [L. S.] |
| Me-ni-nock, his x mark. | [L. S.] | Scha-noo-a, his x mark. | [L. S.] |
| Elit Palmer, his x mark. | [L. S.] | Sla-kish, his x mark. | [L. S.] |

Signed and sealed in the presence of—

     James Doty, secretary of treaties,
     Mie. Jles. Pandosy, O. M. T.,
     Wm. C. McKay,
     W. H. Tappan, sub Indian agent, W. T.,
     C. Chirouse, O. M. T.,
     Patrick McKenzie, interpreter,
     A. D. Pamburn, interpreter,
     Joel Palmer, superintendent Indian affairs, O. T.,
     W. D. Biglow,
     A. D. Pamburn, interpreter.

---

## TREATY WITH THE NEZ PERCÉS, 1855.

June 11, 1855.

12 Stats., 957.
Ratified Mar. 8, 1859.
Proclaimed Apr. 29, 1859.

*Articles of agreement and convention made and concluded at the treaty ground, Camp Stevens, in the Walla-Walla Valley, this eleventh day of June, in the year one thousand eight hundred and fifty-five, by and between Isaac I. Stevens, governor and superintendent of Indian affairs for the Territory of Washington, and Joel Palmer, superintendent of Indian affairs for Oregon Territory, on the part of the United States, and the undersigned chiefs, head-men, and delegates of the Nez Percé tribe of Indians occupying lands lying partly in Oregon and partly in Washington Territories, between the Cascade and Bitter Root Mountains, on behalf of, and acting for said tribe, and being duly authorized thereto by them, it being understood that Superintendent Isaac I. Stevens assumes to treat only with those of the above-named tribe of Indians residing within the Territory of Washington, and Superintendent Palmer with those residing exclusively in Oregon Territory.*

Cession of lands to the United States.

ARTICLE 1. The said Nez Percé tribe of Indians hereby cede, relinquish and convey to the United States all their right, title, and interest in and to the country occupied or claimed by them, bounded and described as

Boundaries.

follows, to wit: Commencing at the source of the Wo-na-ne-she or southern tributary of the Palouse River; thence down that river to the main Palouse; thence in a southerly direction to the Snake River, at the mouth of the Tucanon River; thence up the Tucanon to its source in the Blue Mountains; thence southerly along the ridge of the Blue Mountains; thence to a point on Grand Ronde River, midway between Grand Ronde and the mouth of the Woll-low-how River; thence along the divide between the waters of the Woll-low-how and Powder River; thence to the crossing of Snake River, at the mouth of Powder River; thence to the Salmon River, fifty miles above the place known [as] the "crossing of the Salmon River;" thence due north to the summit of the Bitter Root Mountains; thence along the crest of the Bitter Root Mountains to the place of beginning.

Reservation.

ARTICLE 2. There is, however, reserved from the lands above ceded for the use and occupation of the said tribe, and as a general reserva-

Exhibit 1 Page 5 of 5

# Confederated Tribes and Bands of the Yakama Nation



**Mandi Rae Lumley**

Enrollment #: 12362     1/4

DOB: ███████ 1977     Yakama Blood

1800 Covey Rise Ct     12/27/2024
Spring Hill TN 37174     Issued

Gender: F     HT: 5'1"
Hair: BRN     Eyes: GRN

_Member's Signature_     12/27/2029     _Gerald Lewis_
                         Expires        Tribal Official

**Exhibit 2 Page 1 of 4**



**Confederated Tribes and Bands of the Yakama Nation**
P.O. Box 151
Toppenish, Washington 98948

This is to certify that the official records of this office confirm that the person whose signature appears on the reverse hereof is an enrolled member of the Yakama Nation under the Act of August 9, 1946 (60 Stat. 968); and as such is entitled to all the privileges guaranteed under the Yakama Treaty of 1855.

---

Act of June 2, 1924, PL 68-175 (43 Stat. 253) provides that all Indians born within the limits of the United States are citizens of the United States.

Exhibit 2 Page 2 of 4



Confederated Tribes and Bands of the Yakama Nation
P. O. Box 151
Toppenish, WA 98948

Friday, July 14, 2017

# Certificate of Indian Blood

**Name:** **Mandi Rae Lumley Vander-Pol**

**Date of Birth:** /1977  **Enrollment Status:** **Enrolled**

**Resolution Number:**  **Enrollment Number:** **12362**

**Resolution Date:**  **BIA ID Number:**

**Social Security Num:**

---

*Ethnic Affiliation/Blood Quantum*

Total Quantum All Tribes:   1/4

**Ethnic Group:** **Yakama Nation - (R)**      **Blood Quantum: 1/4**
**Affiliation:** **Yakama**



Michelle S. Sconawah, Enrollment Coordinator        Authorizing Signature


Powered by: Progeny<sup>ES</sup>.com

Page 1


Confederated Tribes and Bands of the Yakama Nation
P. O. Box 151
Toppenish, WA 98948
(509) 865-5121


**Exhibit 2 Page 3 of 4**

FORM BIA – 4432

OMB Control # 1076-0160
Expiration Date: 03-31-2021

# VERIFICATION OF INDIAN PREFERENCE FOR EMPLOYMENT IN THE BUREAU OF INDIAN AFFAIRS AND THE INDIAN HEALTH SERVICE

Complete one of the categories as stated in the Instructions and submit this form with your application for Federal employment.

**CATEGORY A - MEMBERS OF FEDERALLY-RECOGNIZED INDIAN TRIBES, BANDS OR COMMUNITIES**
This is to certify that the person named below is a member of the tribe shown:

| Full Name | Enrollment No. | Date of Birth | Tribal Affiliation |
|---|---|---|---|
| Mandi Rae Lumley | 12362 | [redacted]/1977 | Yakama Nation |

I certify that the above information was taken from the official membership records of the **Yakama** Tribe (or records maintained for the Tribe by the BIA) and acknowledge that falsification and misrepresentation of this information is punishable under Federal Law, 18 U.S.C. 1001.

Certification by Tribal Official:

Signature: [signed] — Date: 07/10/2020

And if required, verification by the BIA Official maintaining the official tribal rolls that the individual is listed on enrollment list maintained by the BIA at the request of the tribe.

Signature of BIA Official _____ Date _____

Print Name & Title of Tribal Official: Michelle S. Sconawah- Yakama Nation / Enrollment Officer

Name/Title _____ Agency _____

**CATEGORY B - DESCENDANTS OF MEMBERS OF FEDERALLY-RECOGNIZED INDIAN TRIBES, BANDS OR COMMUNITIES WHO WERE RESIDING ON ANY INDIAN RESERVATION ON JUNE 1, 1934**

I certify that the applicant named below has established to my satisfaction that he/she is a descendant of an enrolled member of the tribe named below and that the applicant was living on an Indian reservation on June 1, 1934.

Full Name _____ Date of Birth _____

Reservation of Residence on June 1, 1934 _____ Full Name of Ancestor & Tribal Affiliation _____

Title and source of records upon which this is based: _____

BIA Official _____ Date _____

Title _____ Agency _____

**CATEGORY C - PERSONS WHO POSSESS AT LEAST ONE-HALF DEGREE INDIAN BLOOD DERIVED FROM TRIBES INDIGENOUS TO THE UNITED STATES.**

I certify that I have reviewed the documentation to support the below listed individual's claim to possess at least one-half degree Indian blood. The applicant's family history is outlined on the attached family history chart and official records.

Full Name _____ Date of Birth _____ Degree of Blood and Tribal Derivation _____

Title & Source of Records upon which this is based: _____

BIA Official _____ Date _____

☐ Official Records of Tribal Affiliation & Blood Degree
☐ State or Academic Recognition of Indigenous Status

Title _____ Agency _____

**Exhibit 2 Page 4 of 4**